MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By:  CHRISTINE MEDING (CM-8556)
     WILLIAM HARRINGTON (WH-6376)
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007
Tel.: (212) 637-2614 / (212) 637-2331



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x   JUDGE CEDARBAUM

UNITED STATES OF AMERICA,

       Plaintiff,             :

     - v. -             :

ALL ASSETS OF ASA DRUGS, INCLUDING :  VERIFIED COMPLAINT
$207,644.00 IN UNITED STATES
CURRENCY ON DEPOSIT AT JP MORGAN  :  07 Civ.
CHASE, IN ACCOUNT NUMBER ▇▇▇▇
▇ 1 865;

**07 CV 3587**

ALL ASSETS OF NASH PHARMACY,     :
INCLUDING $1,492,892.00 IN UNITED
STATES CURRENCY ON DEPOSIT AT JP   :
MORGAN CHASE, IN ACCOUNT NUMBER ▇▇▇
▇ 4 365; and              :

ALL ASSETS OF STAY SLIM PHARMACY, :
INCLUDING $128,534.00 IN UNITED
STATES CURRENCY ON DEPOSIT AT JP   :
MORGAN CHASE, IN ACCOUNT NUMBER ▇▇▇
▇ 6 065,                :

       Defendants-in-rem.

- - - - - - - - - - - - - - - - x

     Plaintiff United States of America, by its attorney

Michael J. Garcia, United States Attorney for the Southern

District of New York, for its verified complaint, alleges, upon

information and belief, as follows:

## I.    NATURE OF THE ACTION

1.    This *in rem* action is brought by the United States of America *pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984* seeking forfeiture of the following property: seeking forfeiture of all assets of ASA Drugs, Nash Pharmacy and Stay Slim Pharmacy (the "Pharmacies") including the following sums of money:

    a.    ALL ASSETS OF ASA DRUGS, INCLUDING
          $207,644.00 IN UNITED STATES CURRENCY ON
          DEPOSIT AT JP MORGAN CHASE, IN ACCOUNT
          NUMBER ▉▉▉▉▉1 865 (the "ASA Drugs
          Account");

    b.    ALL ASSETS OF NASH PHARMACY, INCLUDING
          $1,492,892.00 IN UNITED STATES CURRENCY
          ON DEPOSIT AT JP MORGAN CHASE, IN
          ACCOUNT NUMBER ▉▉▉▉▉4 365 (the
          "Nash Pharmacy Account"); and

    c.    ALL ASSETS OF STAY SLIM PHARMACY,
          INCLUDING $128,534.00 IN UNITED STATES
          CURRENCY ON DEPOSIT AT JP MORGAN CHASE,
          IN ACCOUNT NUMBER ▉▉▉▉▉6 065,(the
          "Stay Slim Pharmacy Account"),

(collectively, the "Pharmacy Assets").

2.    The Pharmacy Assets are property constituting and derived from the proceeds of a Federal health care offense and a conspiracy to commit a Federal health care offense, namely, a scheme to defraud Medicaid, in violation of 18 U.S.C. §§ 1347 and 1349, or property traceable to such property, and thus are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

2

3.    The Pharmacy Assets also are property constituting
and derived from a conspiracy to commit a Federal health care
offense, namely, a scheme to pay bribes or kickbacks to Medicaid
patients to induce them to purchase medicine, in violation of 18
U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(2)(B), or property
traceable to such property, and thus are subject to forfeiture to
the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

4.    The Pharmacy Assets also are property involved in
actual or attempted money laundering transactions, or property
traceable to such property, in violation of 18 U.S.C. §§ 1956 and
1957, and are thus subject to forfeiture to the United States
pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C).

## II.  JURISDICTION AND VENUE

5.    This Court has jurisdiction pursuant to 28 U.S.C.
§ 1345 and 1355.

6.    Venue is proper pursuant to 28 U.S.C. §
1355(b)(1)(A) because acts and omissions giving rise to the
forfeiture took place in the Southern District of New York, and,
pursuant to 28 U.S.C. § 1395(b), because the Pharmacy Assets are
on deposit at a bank in the Southern District of New York.

## III.  PROBABLE CAUSE FOR FORFEITURE

### Overview

7.    Since at least in or around 2003, MUHAMMED EJAZ
AHMAD, MUHAMMED NAWAZ AHMAD, and others, acting through the

3

Pharmacies, have been engaging in an unlawful activity, namely, a systematic scheme to defraud the Medicaid program ("Medicaid"), which is a Federal health care benefit program.

8.    EJAZ AHMAD, NAWAZ AHMAD and others used three businesses that NAWAZ AHMAD and EJAZ AHMAD controlled – Stay Slim Pharmacy, ASA Drugs, and Nash Pharmacy – to commit the Federal health care fraud scheme.

9.    EJAZ AHMAD, NAWAZ AHMAD and others laundered the proceeds of their health care fraud scheme through the Pharmacies and the Pharmacy Assets.

10.    As alleged in greater detail below, the Ahmad brothers and others paid bribes to HIV-positive Medicaid patients to induce the Medicaid patients to patronize EJAZ AHMAD's medical practice and to use the Pharmacies to fill the prescriptions for HIV-related medications that they received from EJAZ AHMAD.

11.    As alleged in greater detail below, the Ahmad brothers and others committed fraud by causing the Pharmacies (which they controlled) to bill Medicaid for prescriptions for HIV-related medications that were never dispensed to any patients or for dispensed medications that were obtained from unlicensed, illegal sources.    As a result, the Pharmacies received millions of dollars in Medicaid reimbursement, to which they were not entitled.    These millions of dollars were deposited into the Pharmacy Assets, where they were commingled with legitimate

4

proceeds from the Pharmacies' legitimate business.  By
commingling the fraud proceeds with the proceeds from the
Pharmacies' legitimate business, the AHMAD brothers sought to
disguise and obscure the illegitimate source of the fraud
proceeds.

        12.  On December 12, 2006, a federal grand jury in the
Southern District of New York returned an indictment, 06 Cr. 1135
(JGK) (the "Indictment").  Count One of the Indictment charges
MUHAMMAD EJAZ AHMAD, MUHAMMAD NAWAZ AHMAD, and MOHAMMAD TANVEER
(the "Defendants") with a Federal health care offense, namely,
conspiring to pay illegal kickbacks to Medicaid recipients, in
violation of 18 U.S.C. § 371.  Count Two charges the Defendants
with another Federal health care offense, namely, defrauding
Medicaid, in violation of 18 U.S.C. § 1349.  Count Three charges
the Defendants with using the means of identification of real
persons in connection with the Federal health care fraud
conspiracy charged in Count Two, in violation of 18 U.S.C. §
1028A.  A copy of the Indictment is attached as Exhibit A to this
Complaint and is incorporated herein by reference as if set out
in full.

**The Participants in the Federal Health Care Fraud Scheme**

        13.  MUHAMMAD EJAZ AHMAD is a licensed physician in the
State of New York.  During the times relevant to this Complaint,
his office was located at 1121 Coney Island Avenue, Brooklyn, New

5

York or at 1129 Coney Island Avenue.  EJAZ AHMAD is certified by
the American Board of Internal Medicine.

14.  MUHAMMAD NAWAZ AHMAD is the co-owner of Stay Slim
Pharmacy and ASA Drugs d/b/a Script Depot ("ASA Drugs").  Stay
Slim Pharmacy is located at 1166 Coney Island Avenue, Brooklyn,
New York.  ASA Drugs is located at 99-06 63rd Road, Rego Park,
New York.  MUHAMMAD NAWAZ AHMAD is the brother of MUHAMMAD EJAZ
AHMAD (collectively referred to herein as the "AHMAD brothers").

15.  SOBIA SHAHEEN is the wife of MUHAMMED EJAZ AHMAD.
SOBIA SHAHEEN is the co-owner (with MUHAMMAD NAWAZ AHMAD) of Stay
Slim Pharmacy and ASA Drugs.  SOBIA SHAHEEN is also the owner of
Staywell Pharmacy d/b/a Nash Pharmacy ("Nash Pharmacy"), which is
located at 47-07 Francis Lewis Boulevard, Bayside, New York.

16.  Upon information and belief, SHAHEEN does not
actively manage or control any of the Pharmacies.  Instead, EJAZ
AHMAD and NAWAZ AHMAD, among others, actively manage and control
the Pharmacies.

17.  MOHAMMAD TANVEER is an employee of Nash Pharmacy.

### The Victim of the Defendants' Scheme

18.  Medicaid is a state-run health care program that
provides a range of health care services, including inpatient and
outpatient hospital services, nursing facility services, family
planning, physician services, physical therapy and prescription
drugs, to indigent and economically disadvantaged individuals.

6

The program is jointly funded by the United States government and the various state governments.

19.   Medicaid is a "health care benefit program," as defined in 18 U.S.C. § 24(b).

## The Ahmad Brothers' Scheme to Defraud Medicaid Using the Pharmacies and the Pharmacy Assets

### Bribes Paid to Medicaid Patients

20.   Upon information and belief, on numerous occasions in 2005 and 2006, including but not limited to December 22, 2006, December 23, 2006, February 9, 2006, April 26, 2006, and June 9, 2006, MUHAMMAD EJAZ AHMAD met with HIV-positive Medicaid patients and law enforcement officers posing as HIV-positive Medicaid patients (collectively, the "Patients").

21.   Upon information and belief, in the course of his meetings with the Patients, EJAZ AHMAD agreed to write prescriptions for HIV-related medications for the Patients.

22.   Upon information and belief, at the end of the meetings with the Patients, EJAZ AHMAD paid each Patient a sum of cash.

23.   Upon information and belief, EJAZ AHMAD directed the Patients to take the prescriptions to the Pharmacies to be filled.

24.   Upon information and belief, the Pharmacies filled some of the prescriptions for HIV-related medications that EJAZ AHMAD had written for the Patients.

25. On at least one occasion, on or about April 26, 2006, when one of the Patients picked up the prescribed HIV-related medication from Nash Pharmacy, MOHAMMAD TANVEER gave the Patient a sum of cash, in addition to the prescribed medication.

26. On at least one occasion, on or about May 8, 2006, 2006, when one of the Patients received a delivery of the prescribed HIV-related medication from Nash Pharmacy, MOHAMMAD TANVEER gave the Patient a sum of cash, in addition to the prescribed medication.

27. On at least one occasion, on or about August 29, 2006, when one of the Patients received a delivery of the prescribed HIV-related medication from ASA Drugs, MUHAMMAD NAWAZ AHMAD gave the Patient a sum of cash, in addition to the prescribed medication.

28. Nash Pharmacy has billed Medicaid for drugs that were never delivered, as alleged in the following paragraphs.

29. Nash Pharmacy supplied one of the undercover law enforcement officers with a total of three months of HIV-related medications prescribed by MUHAMMAD EJAZ AHMAD, yet billed Medicaid for eight months of prescribed medications. Specifically:

a. Under an alias ("WA"), the officer received a prescription from EJAZ AHMAD.

b. "WA" received the prescribed medications from

8

Nash Pharmacy in December 2005, February 2006 and April 2006.

c.    Nash Pharmacy billed Medicaid for <u>eight</u>
months of the prescribed HIV-related medications for "WA,"
between December 2005 and July 2006, and also attempted to bill
Medicaid for an additional month of the prescribed medications in
August 2006.

d.    On May 19, 2006, Medicaid recorded two new
prescriptions for "WA" even though the undercover officer had not
returned to EJAZ AHMAD for new prescriptions.

e.    The total sum of money billed to Medicaid for
"WA" exceeded $17,000 through July 2006.

30.    Nash Pharmacy supplied a different undercover law
enforcement officer with a total of two months of HIV-related
medications prescribed by MUHAMMAD EJAZ AHMAD, yet billed
Medicaid for eight months of prescribed medications.
Specifically:

a.    Under an alias ("TL"), the officer received a
prescription from EJAZ AHMAD.

b.    "TL" received the prescribed medications from
Nash Pharmacy on two occasions in May and June 2006.

c.    Nash Pharmacy billed Medicaid for monthly
prescriptions for "TL" from December 2004 to July 2006, with the
total billing exceeding $17,000.

31.    Nash Pharmacy billed Medicaid for HIV-related

9

prescriptions that MUHAMMAD EJAZ AHMAD claimed to have written
for one of the Patients ("AS"), but AS never received the HIV-
related medications that EJAZ AHMAD claimed to have prescribed
for him.  Specifically:

        a.    Medicaid records indicate that EJAZ AHMAD
prescribed two injectable medications used to treat HIV-related
complications and other conditions, Procrit and Epogen, for AS.

        b.    Nash Pharmacy billed Medicaid $58,000 for the
Procrit and Epogen prescriptions that EJAZ AHMAD claimed to have
written, over the period August 3, 2004 through May 31, 2006.

        c.    AS has never taken Procrit or Epogen.

        d.    AS never received any Procrit and Epogen from
Nash Pharmacy.

        32.    Upon information and belief, the sums of cash that
MUHAMMAD EJAZ AHMAD, MUHAMMAD NAWAZ AHMAD, and MOHAMMAD TANVEER
paid to the Patients were bribes.  Upon information and belief,
the Defendants paid these bribes to the Patients so that they
could use the Patients' names to submit false bills to Medicaid
for prescription medications that the Patients never ordered or
received.

### The Defendants Committed Fraud by
### Billing Medicaid for Medicines That Were Never Prescribed

        33.    A comparison of the quantity of HIV-related
medications that the Pharmacies purchased from legitimate
wholesale drug distributors to the quantity of HIV-related drugs

10

for which the Pharmacies billed Medicaid demonstrates that the Pharmacies sought reimbursement from Medicaid for HIV-related drugs that the Pharmacies never dispensed to Medicaid patients or for dispensing drugs that the Pharmacies obtained from unlicensed, illegal sources.

34.    In their Medicaid Enrollment Packages, Nash Pharmacy, Stay Slim Pharmacy, and ASA Drugs listed the wholesale drug distributors from which the Pharmacies purchased the drugs that they sold.  In total, three wholesale drug distributors were listed in this first set of wholesale drug distributors.

35.    In addition, ten wholesale drug distributors informed the United States Drug Enforcement Administration that they may have sold controlled substances to one or more of the Pharmacies between January 1, 2001 and July 31, 2006.  Nine of these ten distributors have provided records, and these nine constitute the second set of wholesale drug distributors.  The tenth wholesale drug distributor is out of business.

36.    A comparison of the number of units of drugs that the Pharmacies purchased from these two sets of wholesale drug distributors to the number of units of drugs for which the Pharmacies billed Medicaid shows that the Pharmacies were billing Medicaid for HIV-related prescription medications that the Pharmacies never dispensed to patients and for dispensing drugs that the Pharmacies obtained from unlicensed, illegal sources.

11

37.   The following table sets forth the discrepancy for eight HIV-related medications prescribed by MUHAMMAD EJAZ AHMAD at each of the three pharmacies and indicates the approximate dollar amount in Medicaid charges:

| January 1, 2003 to August 9, 2006 | Units Sold By The Drug Distributors | Units Billed To Medicaid | Discrepancy (Units) | Discrepancy ($$$) |
|---|---|---|---|---|
| Nash Pharmacy | 40 | 5,270 | 5,230 | $ 3,447,105 |
| ASA Drugs | 221 | 1,184 | 963 | $   648,288 |
| Stay Slim Pharmacy | 155 | 919 | 764 | $   512,225 |
| **TOTAL** | **416** | **7,373** | **6,957** | **$ 4,607,618** |

38.   With respect to Nash Pharmacy, the discrepancies set forth in the chart in paragraph 37, supra, demonstrates that the examples of Nash Pharmacy's fraudulent overbilling of Medicaid as described in paragraphs 29 and 30, supra, were not isolated incidents, but rather part of a pervasive and long-standing scheme to defraud that resulted in at least $3.4 million in actual losses to Medicaid attributable to overbilled HIV-related medications.

39.   The discrepancies set forth in the chart in paragraph 37, supra, also indicate that ASA Drugs was also engaged in a pervasive and long-standing scheme to defraud a pervasive and long-standing scheme to defraud that resulted in at least $648,288 in actual losses to Medicaid attributable to overbilled HIV-related medications.

40.   The discrepancies set forth in the chart in

12

paragraph 37, supra, also indicate that Stay Slim Pharmacy was also engaged in a pervasive and long-standing scheme to defraud that resulted in at least $512,225 in actual losses to Medicaid attributable to overbilled HIV-related medications.

41.  The fraud discrepancies set forth in the preceding paragraph exceed the current amounts in the Pharmacies' bank accounts that are included in the Pharmacy Assets.

42.  Upon information and belief, through his ownership and management of the Pharmacies, MUHAMMAD NAWAZ AHMAD caused the Pharmacies to fraudulently overbill Medicaid for prescriptions that the Pharmacies never filled or for dispensed medications that the Pharmacies obtained from unlicensed, illegal sources, as described in the preceding paragraphs.

43.  Upon information and belief, MUHAMMAD EJAZ AHMAD also exercised control over the Pharmacies through his wife, SOBIA SHAHEEN, and therefore caused the Pharmacies to fraudulently overbill Medicaid for prescriptions that the Pharmacies never filled or for dispensed medications that were purchased from unlicensed, illegal sources, as described in the preceding paragraphs.

44.  Upon information and belief, MUHAMMAD EJAZ AHMAD also knowingly participated in the Pharmacies' fraudulent overbilling of Medicaid, as indicated by the bribes that he paid to the Patients for whom he wrote prescriptions for HIV-related

13

medications.

### The Pharmacies Dispensed Black Market Drugs

45.   Upon information and belief, the Pharmacies also billed Medicaid for drugs that the Pharmacies had obtained on the black market, that is, from unlicensed, illegal distributors.

46.   In a search of Stay Slim Pharmacy in September 2006, law enforcement agents discovered medications that appeared to be drugs obtained from black market suppliers (i.e., unlicensed illegal street sources).  For example, the agents discovered drugs stored in containers without the manufacturer inserts and/or wholesaler sticker and sets of medications containing varied lot numbers.

47.   In a search of Nash Pharmacy in September 2006, law enforcement agents discovered medications that appeared to be drugs obtained from black market suppliers.  For example, the agents discovered drugs stored in containers without the manufacturer inserts and/or wholesaler sticker, sets of medications containing varied lot numbers, and plastic baggies filled with large quantities of medications.

48.   In a search of ASA Drugs in September 2006, law enforcement agents discovered medications that appeared to be drugs obtained from black market suppliers.  For example, the agents discovered drugs stored in containers without the manufacturer inserts and/or wholesaler sticker and sets of

14

medications containing varied lot numbers.

### The Pharmacy Assets Contain the Proceeds
### of the Defendants' Federal Health Care Fraud Scheme

49.   The Pharmacy Assets, including the contents of the Pharmacies' bank accounts, include the proceeds of the health care fraud scheme charged in the Indictment.

50.   Upon information and belief, all of the reimbursements that Nash Pharmacy received from Medicaid were deposited into the Nash Pharmacy Account.

51.   Ten Medicaid checks made payable to Nash Pharmacy Inc. between April 24, 2006 and June 26, 2006 were all deposited into the Nash Account.   These checks included false billings for the undercover law enforcement officers described in paragraphs 29 and 30, supra.

52.   Upon information and belief, the proceeds that Nash Pharmacy received from its fraudulent overbilling of Medicaid for HIV-related medications, as described in paragraphs 37 and 38, supra, were deposited into the Nash Pharmacy Account.

53.   Upon information and belief, all of the reimbursements that ASA Drugs received from Medicaid were deposited into the ASA Drugs Account.

54.   Upon information and belief, the proceeds that ASA Drugs received from its fraudulent overbilling of Medicaid, as described in paragraphs 37 and 39, supra, were deposited into the ASA Drugs Account.

15

55.  Upon information and belief, all of the reimbursements that Stay Slim Pharmacy received from Medicaid were deposited into the Stay Slim Pharmacy Account.

56.  Upon information and belief, the proceeds that Stay Slim Pharmacy received from its fraudulent overbilling of Medicaid, as described in paragraphs 37 and 40, supra, were deposited into the Stay Slim Pharmacy Account.

57.  Upon information and belief, the Pharmacies also conducted legitimate pharmacy business.

58.  Upon information and belief, MUHAMMAD EJAZ AHMAD, MUHAMMAD NAWAZ AHMAD, and others, caused the proceeds of the Pharmacies' legitimate pharmacy business to be deposited into the Pharmacy Assets, including bank accounts, where it was commingled with the proceeds of the health care fraud scheme.

IV.  FIRST CLAIM FOR FORFEITURE

59.  Paragraphs 1 through 58 are incorporated as if fully set forth herein.

60.  Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting "specific unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

61.  Title 18, United States Code, Section 1956(c)(7)(F) provides that the term "specified unlawful

16

activity" includes "any act or activity constituting an offense involving a Federal health care offense."

62.   Title 18, United State Code, Section 24 provides that the term "Federal health care offense" includes "a violation of, or a conspiracy to violate . . . [18 U.S.C. §] 1347."

63.   Title 18, United States Code, Section 1347 provides that

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice –
>
>> (1) to defraud any health care benefit program; or
>> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services,

is guilty of a crime.

64.   Title 18, United States Code, Section 24(b) defines a "health care benefit program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

65.   Medicaid is a "health care benefit program" as defined in 18 U.S.C. § 24(b).

17

66.   Title 18, United States Code, Section 1349 provides that anyone who conspires to violate 18 U.S.C. § 1347 is guilty of a crime.

67.   By reason of the foregoing, the Pharmacy Assets are subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 984, because there is probable cause to believe that the Pharmacy Assets are property that constitute or are derived from proceeds traceable to a scheme to defraud Medicaid, which is a health care benefit program, and to fraudulently obtain money under the control of Medicaid, in violation of 18 U.S.C. § 1347, and a conspiracy to defraud Medicaid, in violation of 18 U.S.C. § 1349, namely, the Defendants defrauded Medicaid by submitting fraudulent claims to Medicaid seeking reimbursement for HIV-related prescription medications that the Pharmacies never dispensed or for dispensed medications that the Pharmacies purchased from unlicensed, illegal sources.   The Pharmacy Assets include the funds in the ASA Drugs Account, the Nash Pharmacy Account the Stay Slim Pharmacy Account, which are proceeds of the health care fraud.

### V.   SECOND CLAIM FOR FORFEITURE

68.   Paragraphs 1 through 67 are incorporated as if fully set forth herein.

69.   As alleged in paragraph 60, supra, 18 U.S.C § 981(a)(1)(C) subjects to forfeiture any property that

18

constitutes or is derived from proceeds traceable to "specified
unlawful activity," or a conspiracy to commit such offense.

70.    As alleged in paragraph 61, <u>supra</u>, the term
"specified unlawful activity" includes "any act or activity
constituting an offense involving a Federal health care offense,"
pursuant to 18 U.S.C. § 1956(c)(7)(F).

71.    Title 18, United State Code, Section 24 provides
that the term "Federal health care offense" includes "a violation
of . . . [18 U.S.C. §] 371 . . . if the violation . . . relates
to a health care benefit program."

72.    As alleged in paragraph 65, <u>supra</u>, Medicaid is a
health care benefit program, as defined in 18 U.S.C. § 24(b).

73.    Title 42, United States Code, Section 1320a-
7b(b)(2)(B) provides that

> [W]hoever knowingly and willfully offers or
> pays any remuneration (including any
> kickback, bribe, or rebate) directly or
> indirectly, overtly or covertly, in cash or
> in kind to any person to induce such
> person . . . to purchase, . . . order, or
> arrange for . . . purchasing, . . . or
> ordering any good, facility, service, or item
> for which payment may be made in whole or in
> part under a Federal health care program,

shall be guilty of a crime.

74.    By reason of the foregoing, the Pharmacy Assets
are subject to forfeiture to the United States of America
pursuant to 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 984, because
there is probable cause to believe that the funds in the Pharmacy

19

Assets are property that constitutes or is derived from proceeds traceable to a conspiracy to commit a Federal health care offense, namely, a conspiracy to pay bribes or kickbacks to Medicaid patients to induce them to order HIV-related medications from the Pharmacies, so that the Defendants could later use the names of the Medicaid patients in submitting fraudulent bills to Medicaid, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(2)(B).  The Pharmacy Assets include the funds in the ASA Drugs Account, the Nash Pharmacy Account the Stay Slim Pharmacy Account, which are proceeds of the health care fraud.

## VI.    THIRD CLAIM FOR FORFEITURE

75.    Paragraphs 1 through 74 are incorporated as if fully set forth herein.

76.    Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of . . . section 1956 or 1957 of this title [relating to money laundering], or any property traceable to such property."

77.    Title 18, United States Code, Section 1956 provides, in pertinent part, that

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful

20

activity –

> (A)(I) with the intent to promote
> the carrying on of the specified
> unlawful activity; or . . .
>
> (B) knowing that the transaction is
> designed in whole or in part –
> (I) to conceal or disguise the
> nature, the location, the source,
> the ownership, or the control of
> the proceeds of a specified
> unlawful activity

shall be guilty of a crime.

78.    As alleged in paragraph 61, supra, the term

"specified unlawful activity" includes "any act or activity

constituting an offense involving a Federal health care offense,"

pursuant to 18 U.S.C. § 1956(c)(7)(F).

79.    Title 18, United States Code, Section 1957

provides, in pertinent part, that

> (a) Whoever, in any of the circumstances set
> forth in subsection (d), knowingly engages or
> attempts to engage in a monetary transaction
> in criminally derived property of a value
> greater than $10,000 and is derived from
> specified unlawful activity, shall be
> punished as provided in subsection (b).
>
> * * *
>
> (d) The circumstances referred to in
> subsection (a) are--
> (1) that the offense under this section takes
> place in the United States or in the special
> maritime and territorial jurisdiction of the
> United States . . . .

80.    The term "monetary transactions" is defined in 18

U.S.C. § 1957(f)(1) as the "deposit, withdrawal, transfer, or

exchange, in or affecting interstate or foreign commerce, of funds . . . by, through, or to a financial institution . . . including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title . . . ."

81.  Title 18, United States Code, Section 1956(c)(4)(B) provides that the term "financial transaction" means "a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree."

82.  JP Morgan Chase, the financial institution that holds the funds on deposit in the Pharmacy Assets, is a financial institution that is engaged in or undertakes activities that affect interstate or foreign commerce, within the meaning of 18 U.S.C. § 1956(c)(4)(B).

83.  "Criminally derived property" is defined in 18 U.S.C. § 1957(f)(2) as "any property constituting, or derived from, proceeds obtained from a criminal offense."

84.  "Specified unlawful activity" is defined in 18 U.S.C. § 1957(f)(3) as having the same meaning as that term has in 18 U.S.C. § 1956.

85.  By reason of the above, the contents of the Defendant Accounts are subject to forfeiture to the United States of America pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 18 U.S.C. § 984, because there is probable cause to believe that the funds in

22

the Pharmacy Assets constitute property involved in illegal money

laundering transactions or attempted money laundering

transactions, in violation of 18 U.S.C. §§ 1956 and 1957, and

property traceable to such property.  This forfeiture claim

includes all of the Pharmacy Assets, including the Pharmacies and

their operating accounts, because proceeds of the health care

fraud offenses were laundered through the Pharmacies by means of

their operating accounts to conceal the fraud and to promote the

continuation of the fraud.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Pharmacy Assets and that all persons having an interest in the Pharmacy Assets be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Pharmacy Assets to the United States of America for disposition according to law and that this Court grant plaintiff such further relief as this Court may deem just and proper together with the costs and disbursements in this action.

Dated:     New York, New York
           May 4, 2007

                         MICHAEL J. GARCIA
                         United States Attorney for
                         Plaintiff United States of America

           By:    _____
                         WILLIAM HARRINGTON (WH-6376)
                         CHRISTINE MEDING (CM-8556)
                         Assistant United States Attorneys
                         One St. Andrew's Plaza
                         New York, New York 10007
                         (212) 637-2331/2614 (telephone)
                         (212) 637-2390 (fax)
                         william.harrington@usdoj.gov

24

VERIFICATION

STATE OF NEW YORK                 )
COUNTY OF NEW YORK                :
SOUTHERN DISTRICT OF NEW YORK )

        SHAWN R. MULLEN, being duly sworn, deposes and says

that he is a Special Agent of the United States Federal Bureau of

Investigation ("FBI") and as such has responsibility for the

within action; that he has read the foregoing complaint and knows

the contents thereof, and that the same is true to the best of

his knowledge, information and belief.

        The sources of deponent's information and the grounds

of his belief are his personal involvement in the investigation

described herein, official records and files of the FBI and

Medicaid, other documentary evidence, and conversations with

other law enforcement agents and civilian witnesses.


                          _____
                          SHAWN R. MULLEN
                          Special Agent,
                          Federal Bureau of Investigation


Sworn to before me this
4th day of May, 2007

_____
Notary Public
    MICHAEL D. MAIMIN
 Notary Public, State of New York
     No. 02MA60880??
  Qualified in New Yo??
 Commission Expires March 3, ????

25

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

          - v. -                  :          INDICTMENT

MUHAMMAD EJAZ AHMAD,              :          06 Cr.
MUHAMMAD NAWAZ AHMAD, and
MOHAMMAD TANVEER,                :

                    Defendants.   :

- - - - - - - - - - - - - - - - x

06 CRIM 1135

## COUNT ONE

(Conspiracy to Pay Illegal Kickbacks)

The Grand Jury charges:

1.    From in or about January 2004 up to and including
on or about August 29, 2006, MUHAMMAD EJAZ AHMAD, MUHAMMAD NAWAZ
AHMAD, and MOHAMMAD TANVEER, the defendants, and others known and
unknown, unlawfully, willfully, and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit offenses against the United States.

2.    It was a part and an object of the conspiracy that
MUHAMMAD EJAZ AHMAD, MUHAMMAD NAWAZ AHMAD, and MOHAMMAD TANVEER,
the defendants, and others known and unknown, unlawfully,
willfully, and knowingly, would and did offer and pay
remuneration (including kickbacks, bribes, and rebates), directly
and indirectly, overtly and covertly, in cash and in kind to a
person to induce such person to purchase, lease, order, and
arrange for and recommend purchasing, leasing, and ordering a

good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B).

### Overt Acts

3.    In furtherance of this conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about December 22, 2005, MUHAMMAD EJAZ AHMAD, the defendant, paid a kickback of $40 to an undercover officer whom EJAZ AHMAD believed to be an HIV positive Medicaid patient in Brooklyn, New York.

b.    On or about December 23, 2005, EJAZ AHMAD provided medications and paid a kickback of $40 to an undercover officer whom EJAZ AHMAD believed to be an HIV positive Medicaid patient in Brooklyn, New York.

c.    On or about April 26, 2006, MOHAMMAD TANVEER, the defendant, provided prescription medications and paid a kickback of $40 to an undercover officer whom TANVEER believed to be an HIV positive Medicaid patient in Queens, New York.

d.    On or about August 29, 2006, MUHAMMAD NAWAZ AHMAD, the defendant, provided medications and paid a kickback of

2

$40 to an undercover officer whom NAWAZ AHMAD believed to be an HIV positive Medicaid patient in Bronx, New York.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Conspiracy to Commit Health Care Fraud)

The Grand Jury further charges that:

4.    From in or about January 2004 up to and including on or about August 29, 2006, MUHAMMAD EJAZ AHMAD, MUHAMMAD NAWAZ AHMAD, and MOHAMMAD TANVEER, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States.

5.    It was a part and an object of the conspiracy that MUHAMMAD EJAZ AHMAD, MUHAMMAD NAWAZ AHMAD, and MOHAMMAD TANVEER, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, and with intent to defraud, would and did execute and attempt to execute a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, section 1347.

3

<u>Overt Acts</u>

6.    In furtherance of this conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about December 22, 2005, MUHAMMAD EJAZ AHMAD, the defendant, paid a kickback of $40 to an undercover officer whom EJAZ AHMAD believed to be an HIV positive Medicaid patient in Brooklyn, New York.

b.    On or about December 23, 2005, EJAZ AHMAD provided medications and paid a kickback of $40 to an undercover officer whom EJAZ AHMAD believed to be an HIV positive Medicaid patient in Brooklyn, New York.

c.    On or about April 26, 2006, MOHAMMAD TANVEER, the defendant, provided prescription medications and paid a kickback of $40 to an undercover officer whom TANVEER believed to be an HIV positive Medicaid patient in Queens, New York.

d.    On or about August 29, 2006, MUHAMMAD NAWAZ AHMAD, the defendant, provided medications and paid a kickback of $40 to an undercover officer whom NAWAZ AHMAD believed to be an HIV positive Medicaid patient in Bronx, New York.

(Title 18, United States Code, Section 1349.)

4

<u>COUNT THREE</u>

(Aggravated Identity Theft)

The Grand Jury further charges:

7.    From in or about August 2004 up to and including in or about April 2005, in the Southern District of New York, MUHAMMAD EJAZ AHMAD, MUHAMMAD NAWAZ AHMAD, and MOHAMMAD TANVEER, the defendants, during and in relation to the offense charged in Count Two of this Indictment, unlawfully, willfully, and knowingly, did transfer, possess, and use, without lawful authority, a means of identification of another person, to wit, EJAZ AHMAD obtained the names, dates of birth, and medicaid numbers of numerous persons and then EJAZ AHMAD, NAWAZ AHMAD, and TANVEER used that information in connection with the offense charged in Count Two.

(Title 18, United States Code, Sections 1028A and 2.)

<u>FORFEITURE ALLEGATION</u>

<u>AS TO COUNTS ONE, TWO, AND THREE</u>

8.    As the result of committing the federal health care fraud offenses alleged in Counts One, Two and Three of this Indictment, MUHAMMAD EJAZ AHMAD, MUHAMMAD NAWAZ AHMAD, and MOHAMMAD TANVEER, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, that constitutes or is derived, directly or indirectly,

5

from gross proceeds traceable to the commission of the offenses,
including but not limited to:

        a.   A sum of money representing the amount of
gross proceeds obtained as a result of the said offenses, for
which the defendants are jointly and severally liable;

        b.   The contents of Chase account number ██████
██1 865, held in the name of ASA Drugs;

        c.   The contents of Chase account number ██████
██6 065, held in the name of Nash Pharmacy; and

        d.   The contents of Chase account number ██████
██6 065, held in the name of Stay Slim Pharmacy.

### Substitute Asset Provision

    9.   If any of the above-described forfeitable
property, as a result of any act or omission of the defendants:

(a)   cannot be located upon the exercise of due
      diligence;

(b)   has been transferred or sold to, or deposited
      with, a third person;

(c)   has been placed beyond the jurisdiction of the
      Court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which
      cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C.

§ 853(p), to seek forfeiture of any other property of said

defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 371, 982, 1028A, and
1349.)


FOREPERSON


MICHAEL J. GARCIA
United States Attorney


7

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

**MUHAMMAD EJAZ AHMAD,**
**MUHAMMAD NAWAZ AHMAD, and**
**MOHAMMAD TANVEER,**

Defendants.

### INDICTMENT

06 Cr.

(18 U.S.C. §§ 371, 1349, 1028A, and 2.)

_____MICHAEL J. GARCIA_____
United States Attorney.

**A TRUE BILL**

_Rafael E. Vail_

Foreperson.

12/12/06  Filed Indictment. Case assigned to Judge Koeltl

Pitman
U.S.M.J.